IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LIRON EDWARDS,                    )
                                  )
            Petitioner,           )
                                  )
      v.                          )      Case No.  4:21-CV-01489-AGF
                                  )
PAUL BLAIR,                       )
                                  )
            Respondent.           )

## MEMORANDUM AND ORDER

This matter is before the Court on the pro se petition of Missouri state prisoner Liron Edwards for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a jury of one count of first-degree robbery, one count of armed criminal action, and two counts of second-degree robbery.  He was sentenced to four concurrent terms of 30 years' imprisonment in the Missouri Department of Corrections, and his convictions were affirmed on appeal.

In his federal habeas petition, Petitioner raises two claims of ineffective assistance of counsel.  For the reasons set forth below, habeas relief will be denied.

## BACKGROUND

The charges against Petitioner stemmed from three separate robberies that occurred in 2014.  Count I charged Petitioner with robbery in the first degree for forcibly stealing a cell phone and bookbag from Joyce Rodriguez on August 3, 2014, in the course of which he displayed a deadly weapon; Count II charged Petitioner with armed criminal action related to the above-noted robbery.  Count III charged Petitioner with robbery in

the second degree for forcibly stealing a purse from Amber Reedy on July 21, 2014.

Count IV charged Petitioner with robbery in the second degree for forcibly stealing a

purse from Lauren Grellner on October 2, 2014.  The following facts relevant to each

count were established at trial; the incidents will be discussed chronologically.

**Count III**

Amber Reedy took a bus home from work around 10:00 p.m. on July 21, 2014.

Upon reaching her stop at the corner of Kingshighway and Devonshire, Reedy exited the

bus and two men passed within two feet of Reedy.  The two men said "hey" to Reedy,

and Reedy responded with "hey" even though she did not know the two men.  Reedy then

continued walking down Devonshire toward her home on Brannon because Devonshire

had better lighting.

Reedy was about six houses away from her home when she noticed one of the men

from the bus stop walking toward her.  Reedy, who was eight months pregnant at the

time, grabbed her purse with her left hand and continued walking.  The man then lunged

toward her and said, "give me your purse."  Reedy asked if she could at least keep her

phone as she was concerned she would go into labor and not have her phone.  The man

responded, saying "I said give me your purse," and then ripped the purse from Reedy's

arm.  Reedy screamed for help and a couple came out of their house and called police.

The man then fled on foot between two houses.

Police later arrived and interviewed Reedy.  She gave them a description of the

man.  She also told police that her Samsung Galaxy cell phone was in her purse at the

time it was stolen and gave police the serial number for the phone.

**Counts I and II**

Jocelyn Rodriguez was a student at Washington University Medical School.  In 2014, she lived on Chouteau about a half mile from the medical school campus.  On August 3, 2014, around 10:00 p.m., Rodriguez  began walking home from the medical campus with her phone in her hand.  She was carrying her backpack, which held her wallet and iPad.  Rodriguez used the Taylor Avenue bridge to cross Interstate 64.  While walking toward Chouteau on the Taylor Avenue bridge, she saw a man walking toward her.  He got within two feet of Rodriguez and said, "give me your phone."  The man was holding a gun and aiming it at Rodriguez.  She gave him her phone and he stated, "give me your bag."  Rodriguez complied while standing face to face with the man and looking at his face.  He instructed her to turn around as she walked away, and she complied.

She later flagged down a woman who was driving by and used the woman's phone to call police.  Police later took Rodriguez's statement at her apartment.  Rodriguez then attempted to locate her phone with her laptop but was unable to do so.  About one week later, the phone location "popped up" and indicated the phone was in Mississippi.

**Count IV**

On October 2, 2014, Lauren Grellner drove to her apartment at 5032 Murdoch around 6:30 or 7:30 p.m.  This apartment was located about one block south of the location where Reedy was robbed.  She parked on the street and walked to her apartment.  She entered the lobby of her apartment building holding her purse, phone, keys, coffee mug, and some papers.  As Grellner started walking up the stairs, a man entered the lobby.  She then noticed a tug on her left side, and she was pulled down the stairs by her

3

purse.  She tried to pull herself up with the arm that was still inside the purse strap as she

was drug across the foyer and hit her head on the doorjamb.  She then let go of the purse,

and the man ran away.  Grellner could see the man's face because it was not covered.

She then called the police and provided a statement.

Detective Leonard Blansitt of the St. Louis Metropolitan Police Department

investigated the robbery of Reedy.  This investigation led him to a home at 4923

Devonshire.  Petitioner was one of several people connected to this address.  Detective

Blansitt then obtained a photograph of Petitioner, which matched the description Reedy

provided.  Detective Blansitt created a photographic lineup that included this photograph

of Petitioner.  Upon showing this photographic lineup to Reedy on October 2, 2014,

Reedy immediately recognized Petitioner as the man who stole her purse.  Detective

Blansitt showed the photographic lineup, which included Petitioner, to Grellner on

October 5, 2014.  Grellner identified Petitioner as the man who stole her purse.

A few months later, in January of 2015, Detective Blansitt and another detective

interviewed a woman who lived at 4923 Devonshire.  She gave them permission to

search the home, where they found a backpack in a room containing Petitioner's

property.  This backpack contained a cable bill, which showed Petitioner's address as

4923 Devonshire and two checks that had Rodriguez's name on them.  The detectives

gave the checks to Detective Joshua Wenstrom, also of the St. Louis Metropolitan Police

Department, who was investigating Rodriguez's robbery.

Upon receipt of the checks, Detective Wenstrom created a photographic lineup

that included Petitioner.  This lineup was shown to Rodriguez, who identified Petitioner

4

as the man who robbed her.  Rodriguez also identified the checks, stating that they had

been in her backpack.

In February 2015, Detective Blansitt learned that Petitioner sold a cell phone with

the same serial number as the one provided by Reedy at an automated ecoATM kiosk.

Records from the ecoATM kiosk showed Petitioner sold the stolen Samsung Galaxy S3

on July 23, 2014, at 4:38 p.m., two days after Reedy was robbed.  The ecoATM kiosk

records included photographs of Petitioner using the kiosk.

Petitioner was indicted on Count III (relating to victim Reedy) on February 26,

2015.[1]  He was then arrested on March 12, 2015, in Illinois.  On March 16, 2015,

Petitioner was taken to the South Patrol Division of the St. Louis Metropolitan Police

Department.  Detective Blansitt's arrest report with respect to this, transfer stated:

> I advised [Petitioner] that he was under arrest and further advised him of the
> above incidents.  I then advised [Petitioner] of his Miranda rights. [Petitioner]
> stated that he understood his rights and immediately stated that he wanted a
> lawyer.  [Petitioner] was then placed in the below sequential physical line-
> up . . . .

Resp. Ex. J at 4.

At trial, Detective Blansitt testified that, prior to the physical lineup,

Petitioner waived his right to an attorney.  Specifically, Detective Blansitt testified

as to the physical lineup forms he completed, and he testified that these forms

indicated Petitioner waived his right to an attorney with respect to the lineup.

---

[1]      Petitioner was not indicted on the other counts (relating to victims Grellner and
Rodriguez) until March 17, 2015.

Resp. Ex. A at 468.[2]  Detective Blansitt further testified that he advised Petitioner

of his right to an attorney, to which Petitioner responded by saying "Do what

you're going to do."  *Id*. at 469.

Petitioner was placed in a physical line-up on March 16, 2015.  Reedy viewed the

lineup and identified Petitioner as the man who robbed her.  Rodriguez and Ms. Grellner

also each independently viewed the physical line-up and identified Petitioner as the man

who robbed them.  Petitioner was indicted on the counts relating to Grellner and

Rodriguez (Counts I, II, and IV) the following day, March 17, 2015, and these counts

were consolidated with the charge involving Reedy for trial.  Petitioner challenged the

joinder and unsuccessfully moved to dismiss or sever the charges on this basis.

All three victims testified at trial as to their identifications in both the

photographic and physical lineups; all three independently identified Petitioner as their

assailant in court; and all three testified that they did not know each other and that they

were not pressured to identify anyone in any of the lineups.

At trial, Petitioner's counsel confronted Detectives Blansitt and Wenstrom with St.

Louis Metropolitan Police Department's Special Order SO 8-01 in an attempt to discredit

the photographic lineup identifications made by the three victims.  SO 8-01 was issued on

July 28, 2014, and outlined the Department's procedures related to arrests and bookings.

---

[2]        There were two forms completed for the March 16, 2015 physical lineups. The
first form did not indicate whether Petitioner waived his right to counsel; however, as
Detective Blansitt testified, the second form indicated Petitioner did waive his right to
counsel.  *See* Resp. Ex. J at 4.

6

Resp. Ex. H.  SO 8-01 addressed pre-trial identifications and stated that its purpose was "[t]o establish uniform procedures for (1) conducting pre-trial identifications; (2) guaranteeing accuracy and fairness in such identifications, and (3) satisfying legal requirements governing pre-trial identifications."  *Id*.

The detectives testified that they were not familiar with SO 8-01 at the time of the lineups or at trial.  The detectives stated that they had not read SO 8-01 or known of its promulgation at the time of trial.  After familiarizing themselves with the special order while on the witness stand, they also admitted that the identifications of Petitioner, including both the photographic and physical line-ups, violated the special order for numerous reasons, including that a blind administrator (someone who did not know which member of the line-up was the true suspect) did not conduct the photographic lineup as required by the special order.  Resp. Ex. A at 497.

At the close of evidence, the jury was instructed on the applicable law and began deliberations.  The jury deliberated for approximately three hours before sending out a note stating: "We are stuck on Counts I and II—vote is 11 to one for guilty but can't sway the not-guilty person.  Stuck on Count III, as well, at seven to five with no openness to movement.  Need some guidance."  *Id.* at 712.

Over the defense's objection, the trial court read to the jury a so-called "hammer instruction"[3] at 4:34 p.m.  The jury then deliberated until 5:20 p.m. when it was released for the evening.

---

[3]     The hammer instruction was taken from the Missouri Approved Instructions, MAI-312.10, and stated:

The trial court instructed the jury to return the next day at 9:00 a.m. to continue deliberations.  The following day at 11:20 a.m., after the jurors had communicated to the trial court that they reached a verdict but before the verdicts had been returned, defense counsel made a motion for a mistrial, arguing that the hammer instruction had a coercive effect.  The trial court denied the motion for a mistrial, and the verdicts were thereafter returned.

The jury found Petitioner guilty on all counts.  On April 27, 2017, the trial court sentenced Petitioner as a prior and persistent felony offender to concurrent terms of 30 years' imprisonment on each count.

**Direct Appeal**

On direct appeal, Petitioner, through counsel, argued that (1) the trial court clearly erred in denying Petitioner's motion to dismiss improperly joined counts or, in the alternative, for severance of offenses, and (2) the trial court erred and abused its discretion in giving the hammer instruction and in failing to grant a mistrial.

---

You should make every effort to reach a verdict, as it is desirable that there be a verdict in every case. Each of you should respect the opinions of your fellow jurors as you would have them respect yours, and in a spirit of tolerance and understanding endeavor to bring the deliberations of the whole jury to an agreement upon a verdict. Do not be afraid to change your opinion if the discussion persuades you that you should. But a juror should not agree to a verdict that violates the instructions of the Court, nor should a juror agree to a verdict of guilty unless he is convinced of the defendant's guilt beyond a reasonable doubt.

Resp. Ex. E at 3.

The Missouri Court of Appeals rejected both arguments and affirmed Petitioner's conviction.  As to Petitioner's first argument, the appellate court held that joinder was proper because the offenses were of the "same or similar character."  Resp. Ex. E at 4-5. Specifically, the court noted that these robberies were sufficiently similar in terms of the victims involved, time and location, items taken, type of force used or threatened, and actions of the assailant.  The appellate court thus held that joinder was proper.

The appellate court also rejected Petitioner's second argument. The court held that hammer instruction was designed precisely for these circumstances, where the jury had deliberated for some time and sought guidance from the court on handling a potential deadlock.  The court noted the jury continued deliberating for more than three hours after receiving the hammer instruction, demonstrating that the jury followed the instruction's guidance.  Accordingly, the appellate court held that Petitioner failed to show the verdict was coerced or that the trial court abused its discretion.

**State Post-Conviction Proceedings**

On December 12, 2018, Petitioner filed a pro se motion for post-conviction relief.[4] The motion court then appointed counsel, who filed an amended post-conviction relief motion on May 17, 2019.

Petitioner's amended motion for post-conviction relief stated that it was incorporating Petitioner's pro se claims and expanding upon two of his claims alleging

---

[4]     Respondent did not attach a copy of the pro se motion for post-conviction relief as an exhibit to its brief in this case.  But because the Court's analysis does not turn on the issues raised in the pro se motion, the Court need not review that motion to resolve the instant habeas petition.

ineffective assistance of counsel.  Resp. Ex. F.  As to the first claim, Petitioner argued that trial counsel was ineffective for failing to move to suppress or object to the out-of-court and in-court identifications of Petitioner, including: (a) the three photographic lineups, which each violated Special Order SO 8-01 and rendered the identifications unduly suggestive and unreliable; (b) the pre-indictment physical lineup identifications of Petitioner by Grellner and Rodriguez, which each violated the above-noted special order and likewise rendered the identifications unduly suggestive and unreliable; and (c) the post-indictment physical lineup identification of Petitioner by Reedy, as the lineup not only violated the special order and was unreliable, but also violated Petitioner's constitutional right to counsel, which attached at the post-indictment phase.  With respect to the final argument challenging the post-indictment physical lineup, Petitioner argued that Detective Blansitt's police report indicated that Petitioner invoked his right to counsel at the time of his arrest but that Petitioner had not been provided with counsel prior to the lineup, in violation of his constitutional rights.

Petitioner's second claim for post-conviction relief alleged that trial counsel was ineffective for failing to impeach Detective Blansitt on his testimony that Petitioner had waived his right to counsel prior to the physical lineup.  Petitioner argued that this testimony conflicted with Detective Blansitt's police report, which indicated that Petitioner had invoked his right to counsel at the time of his arrest.

The motion court held an evidentiary hearing on July 8, 2019, at which Petitioner's trial counsel, Joseph Whitener, testified as the sole witness.  Resp. Ex. G.  At this hearing, Whitener testified that he believed there was no legal basis for moving to

10

suppress or objecting to the three photographic lineup identifications of Petitioner or to the victims' in-court identifications of Petitioner at trial.  Whitener testified that the police procedures related to the lineups were not in his opinion so deficient that they would be legally inadmissible.  However, Whitener believed the procedures did cast substantial skepticism on the detectives' credibility and could have persuaded a jury that the identifications were not sufficiently reliable for the purpose of convicting Petitioner beyond a reasonable doubt.  *Id.* at 31.  Therefore, although Whitener did not believe there was a legal basis to seek suppression of the identifications, his strategy was to highlight the problems with the identifications as a means to discredit the police officers at trial.

Whitener also testified that he did not move to suppress the post-indictment identification of Petitioner by Reedy at the physical lineup because he believed that Petitioner waived his right to counsel prior to the lineup.  *Id*. at 22.  Whitener identified an arrest report by Detective Blansitt, which reflected that Petitioner requested a lawyer at the time of his transfer to the South Patrol Division on March 16, 2015, and that Petitioner was then placed in a physical lineup.  Whitener also identified the lineup forms generated by Detective Blansitt, which indicated that Petitioner "waived his right to an attorney prior to the lineup taking place."  *Id.* 19-20; 25-26.  Whitener testified that he was aware of the legal principles that "a post-indictment lineup is a critical state of prosecution at which the defendant is entitled to aid of counsel," that "the admission of an in-court identification without determination that they were not tainted by an illegal lineup was Constitutional error," and that "testimony that witnesses had identified the defendant at an illegal lineup were per se inadmissible."  *Id.* at 21.

11

However, Whitener testified that, in this case, it was unclear when Petitioner had initially requested an attorney "in relation to when the lineup occurred." *Id.* at 22. Whitener acknowledged that he never questioned Detective Blansitt or Detective Wenstrom about Petitioner's waiver of counsel and the "timing of how this all happened." *Id.* at 22-23. Whitener also agreed that the relevant transcripts showed that Detective Wenstrom "spent at least an hour and a half or two hours" with Petitioner "from the time he picked him up in Illinois to conducting the lineup procedure" *Id.* at 23. Nevertheless, Whitener testified that he did not believe there was a conflict between Detective Blansitt's report and the lineup form because the report stated that Petitioner requested an attorney at the time that he was initially transferred, and the lineup form showed that Petitioner subsequently waived his right to an attorney. Whitener concluded that it was "entirely possible for a person to request an attorney and then subsequently waive that right to an attorney," and Whitener testified that was what he "believe[d] happened here." *Id.* at 22.

With respect to Petitioner's second claim, Whitener testified that he did not attempt to impeach Detective Blansitt's testimony regarding whether Petitioner invoked or instead waived his right to counsel because he felt that "the State would pretty easily be able to rehabilitate Detective Blansitt with the prior consistent statement of [Petitioner] waiving his right to an attorney through Exhibit Number 8 where [Detective Blansitt] says in his lineup form that [Petitioner] waived his right to an attorney[.]" *Id.* at 28. Whitener thus felt that an objection to or attempt to impeach Detective Blansitt's

testimony "A, was too minor to make, really; and B, might very well end up enhancing [the detective's] credibility and hurting [Whitener's] own." *Id.*

The motion court denied Petitioner's motion for post-conviction relief on January 7, 2020.  Resp. Ex. K.  In denying Petitioner's motion, the court held that Petitioner failed to demonstrate a valid legal basis for suppressing any of the out-of-court identifications or for objecting to the in-court identifications at trial.  The motion court noted that the detectives' mere failure to comply with police department procedures did not render the photographic or physical line-ups unconstitutionally suggestive or unreliable.  The motion court reasoned that "[a] determination of the suggestiveness of the lineup requires an examination of the process including an evaluation of the conditions under which the identification occurred which are attributable to the police, including any police commentary," and that Petitioner had not shown that procedures here were unnecessarily suggestive or unreliable.  *Id.* at 7-8.  The motion court thus found that Whitener's explanation for not challenging the identifications was both reasonable and legally correct, and that his strategy of referencing the violation of procedures to cast doubt on the reliability of the identifications was also reasonable.

As to Petitioner's second claim, the motion court held it was without merit because Whitener gave a reasonable explanation for not pursuing impeachment of Detective Blansitt's testimony as to whether Petitioner requested counsel prior to the physical line-up.  The motion court noted that the record, including the relevant police reports and Detective Blansitt's testimony, supported Whitener's belief that while

Petitioner initially requested counsel at the time of his transfer, he waived that right at the time of the lineups.  *Id.* at 8.

On appeal from the denial of post-conviction relief, Petitioner, through appointed counsel, preserved only Petitioner's claims relating to Petitioner's right to counsel at the post-indictment physical lineup identification by Reedy.  Petitioner did not preserve his claims relating to the photographic lineup identifications by all three victims, the pre-indictment physical lineup identifications by Grellner and Rodriguez, or the detectives' failure to follow police procedures or use of unreliable procedures (except as those procedures related to the right to counsel).

Specifically, Petitioner argued on appeal that (1) the motion court clearly erred in denying his claim that trial counsel was ineffective for failing to move to suppress Reedy's post-indictment physical lineup identification (and her in-court identification at trial) because the lineup violated Petitioner's constitutional rights to counsel and a fair trial in that it was conducted without counsel present despite Petitioner's earlier request for an attorney after his arrest, and (2) the motion court clearly erred in denying his claim that trial counsel was ineffective for failing to impeach Detective Blansitt on his testimony that Petitioner waived his right to an attorney at the physical lineup with his arrest report indicating that Petitioner had requested counsel after his arrest.

Petitioner's argument on appeal stressed that, notwithstanding the lineup form and Detective Blansitt's trial testimony indicating that Petitioner waived his right to counsel at the lineup, there was no evidence that such waiver was voluntary and intelligent in light of Petitioner's earlier invocation of his right to counsel.  Specifically, Petitioner

14

relied on the Supreme Court's holding in *Edwards v. Arizona*, 451 U.S. 477 (1981), that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights," and that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  451 U.S. at 484–85.

The Missouri Court of Appeals rejected this argument.  In affirming the motion court's decision as to Petitioner's first claim, the Missouri Court of Appeals held that the record, including Detective Blansitt's testimony, indicated that Petitioner was advised of his *Miranda* rights and waived his right to counsel at the time of the lineup.  The court noted that Petitioner "did not present any testimony either at trial or the post-conviction evidentiary hearing to challenge Detective Blansitt's testimony that Movant waived his right to counsel at the lineup."  Resp. Ex. J at 9.

The state court also rejected Petitioner's argument, based on *Edwards*, that his waiver was invalid in light of his earlier invocation of his right to counsel.  The court discussed the reasoning of *Edwards* and further noted the Supreme Court's later decision in *Montejo v. Louisiana*, 556 U.S. 778 (2009), which held that "[t]he *Edwards* rule is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights" and that the *Edwards* rule "does not govern noninterrogative

types of interactions between the defendant and the State (like pretrial lineups)."  Resp.

Ex. J at 9-10 (quoting *Montejo*, 556 U.S. at 786, 795).

The Missouri Court of Appeals thus held that "the *Miranda-Edwards* presumption

against the validity of a defendant's waiver of his right to counsel did not apply here" and

that "[a] motion to suppress the postindictment lineup and in-court identifications based

on [Petitioner's] counsel not being present at the post-indictment lineup would have been

without merit."  Resp. Ex. J at 10.

As to Petitioner's second claim, the Missouri Court of Appeals held that

Whitener's strategic decision to not impeach Detective Blansitt on a possible discrepancy

was reasonable.  The court noted that Petitioner had not established that there was a basis

for impeachment, as the two pieces of evidence Petitioner relied upon (the arrest

reporting noting that Petitioner requested an attorney after being advised of his *Miranda*

rights, and the lineup forms indicating that Petitioner waived his right to attorney at the

time of the lineup) "do not necessarily conflict."  *Id.* at 11.  The state court credited

Whitener's testimony at the evidentiary hearing that he "believed the possible

discrepancy between the police report and lineup forms was of questionable

impeachment value, and [that] eliciting testimony from Detective Blansitt on that matter

could have caused [Petitioner] more harm than benefit."  *Id*. at 12.  The court concluded

that this decision was reasonable and did not constitute ineffective assistance.

**Federal Habeas Petition**

As indicated above, Petitioner now raises two grounds for federal habeas relief.

Petitioner asserts that trial counsel was ineffective (1) because counsel did not move to

16

suppress or object to the three victims' out-of-court identifications of him from the three

photographic lineups due to the use of suggestive procedures, which led to unreliable

identifications and (2) because counsel did not move to suppress Reedy's post-indictment

physical lineup identification of Petitioner.

## **DISCUSSION**

**Legal Standard**

Federal habeas relief is available to a state prisoner "only on the ground that he is

in custody in violation of the Constitution or laws or treaties of the United States."  28

U.S.C. § 2254(a).   Where a claim has been adjudicated on the merits in state court, the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that habeas

relief cannot be granted unless the state court's adjudication:

> 1) resulted in a decision that was contrary to, or involved an unreasonable
>    application of, clearly established Federal law, as determined by the
>    Supreme Court of the United States; or
>
> 2) resulted in a decision that was based on an unreasonable determination
>    of the facts in light of the evidence presented in the State court
>    proceedings.

28 U.S.C. § 2254(d).

The Sixth Amendment guarantees a criminal defendant the right to effective

assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In order to

show ineffective assistance of counsel, "a [petitioner] must show that counsel's

performance was deficient," and "that the deficient performance prejudiced [his]

defense."  *Id.* at 687.  When "[c]onsidering an attorney's performance, [the court] must

indulge a strong presumption that the conduct was reasonable, and the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Paulson v. Newton Corr. Facility*, 773 F.3d 901, 904 (8th Cir. 2014) (citation and internal quotation marks omitted).  In other words, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *White v. Dingle*, 757 F.3d 750, 752 (8th Cir. 2014) (citation omitted).  In order to show prejudice, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 753 (citation omitted).

**Procedurally Defaulted Claim (Claim1)**

Under the doctrine of procedural default, a federal habeas court is barred from considering the merits of a claim not fairly presented to the state courts, absent a showing by the petitioner of cause for the default and prejudice resulting therefrom, or that he is actually innocent, such that a miscarriage of justice would result by failing to consider the claim.  *E.g., Murphy v. King*, 652 F.3d 845, 848-49 (8th Cir. 2011).  In Petitioner's first habeas claim, he asserts that trial counsel was ineffective for failing to move to suppress or object to the three victims' identifications of him from the three photographic lineups due to the use of suggestive procedures, which led to unreliable identifications.  This claim was raised in Petitioner's amended motion for post-conviction relief, but Petitioner did not preserve the claim in his appeal to the Missouri Court of Appeals.

In Missouri, "a claim [must] be presented 'at each step of the judicial process' in order to avoid default." *Jolly v. Gammon,* 28 F.3d 51, 53 (8th Cir. 1994) (quoting *Benson v. State*, 611 S.W.2d 538, 541 (Mo. Ct. App. 1980)).  "Failure to raise a claim on appeal from the denial of a post-conviction motion erects a procedural bar to federal habeas review."  *Id.*  Accordingly, the Court agrees with Respondent that Petitioner's first claim was procedurally defaulted in state court.

Petitioner has shown neither cause to excuse the default[5] nor that a miscarriage of justice will result if his defaulted claims are not considered.  *See Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006) (holding that a petitioner must present new evidence that affirmatively demonstrates that he is actually innocent of the crime for which he was convicted in order to fit within the miscarriage of justice exception).  The Court's review of Claim 1 is therefore barred, and habeas relief will be denied on this ground.

**Remaining Claim (Claim 2)**

As to the remaining claim that was not defaulted, the Court concludes it is without merit. When addressing a claim already addressed by state courts, "[t]aken together, AEDPA and *Strickland* establish a doubly deferential standard of review." *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (citation omitted).  It is not sufficient for a petitioner to "show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).  "Rather, he

---

[5]     Petitioner has not alleged ineffective assistance of post-conviction appellate counsel, and in any event, such an allegation has not been recognized as cause to excuse a procedural default in the habeas context. *See Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012).

must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id*. at 699.

Petitioner's remaining claim pertains to the post-indictment physical line-up of Petitioner, viewed by Reedy.  Specifically, Petitioner claims ineffective assistance of trial counsel because counsel did not move to suppress the identification by Reedy of Petitioner at a post-indictment physical lineup at which no attorney for Petitioner was present.  As Respondent notes, this claim relates only to the second-degree robbery conviction in Count III, as the indictments on the other counts occurred the day after the physical lineup in question.

There is no dispute that Petitioner had a Sixth Amendment right to counsel at the post-indictment physical line-up identification by Reedy, as required by *United States v. Wade*, 388 U.S. 218, 236-37 (1967) (explaining that a post-indictment lineup, as opposed to a pre-indictment lineup, is a "critical stage of the prosecution" at which the Sixth Amendment right attaches).  Nor is there any dispute that such right to counsel could be waived by Petitioner so long as the waiver was voluntary, knowing, and intelligent.  *See Montejo,* 556 U.S. at 786.  The Missouri Court of Appeals correctly recognized as much.

The state court likewise reasonably concluded based on the record before it that Petitioner waived his right to counsel prior to the lineup and that such waiver was valid. The evidence at trial established that Petitioner was read his *Miranda* rights by Detective Blansitt, waived these rights, and signed a waiver form.  *See id.* at 786 (explaining that "when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick

20

[for establishing a valid waiver] even though the *Miranda* rights purportedly have their source in the *Fifth* Amendment").

As the state court correctly held, Petitioner did not present any evidence to challenge Detective Blansitt's testimony and the waiver form clearly indicating that Petitioner was read his *Miranda* rights and waived his right to counsel at the lineup in question.

Petitioner's argument on appeal from denial of post-conviction relief rested on his earlier invocation of his right to counsel after his arrest (as reflected in Detective Blansitt's arrest report), and on the Supreme Court's holding in *Edwards v. Arizona* that when a person expresses his desire to interact with police through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484-85.

However, the Missouri Court of Appeals reasonably rejected Petitioner's argument. As the state court noted, the Supreme Court has limited *Edwards* holding to the context of custodial interrogations. The Supreme Court has never held that *Edwards* applies in other post-indictment interactions, such as lineups.

Indeed, the Supreme Court has disclaimed such an extension. In *Montejo*, the Supreme Court explained that:

> The *Miranda-Edwards* regime . . . applies only in the context of custodial interrogation. If the defendant is not in custody then those decisions do not apply; nor do they govern other, *noninterrogative types of interactions between the defendant and the State (like pretrial lineups)*. However, those uncovered situations are the least likely to pose a risk of coerced waivers.

> When a defendant is not in custody, he is in control, and need only shut his door or walk away to avoid police badgering.   And *noninterrogative interactions with the State do not involve the "inherently compelling pressures," that one might reasonably fear could lead to involuntary waivers.*

*Id.* at 795 (cleaned up and emphasis added).

Language in other Supreme Court cases likewise suggests that the rule in *Edwards* applies only in the context of custodial interrogation.  *See, e.g.*, *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (noting that the purpose of the *Miranda–Edwards* guarantee is in one respect narrower than the interest protected by the Sixth Amendment guarantee because it relates only to custodial interrogation); *Minnick v. Mississippi,* 498 U.S. 146, 154 (1990) ("*Edwards*' purpose [is] to protect the suspect's right to have counsel present at custodial interrogation").

In light of the rationale behind *Edwards,* the fact that the Supreme Court has suggested that *Edwards* does not apply to non-interrogative interactions, and the fact that the Supreme Court has never extended *Edwards* to invalidate an otherwise valid waiver of counsel at a post-indictment line-up, Petitioner is unable to show that the Missouri Court of Appeals' rejection of his *Edwards* claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *See Harrington v. Richter*, 562 U.S. 86, 103 (2011) (setting forth habeas standard).   Habeas relief is therefore unwarranted.

## <u>CONCLUSION</u>

The Court concludes that Petitioner is not entitled to federal habeas relief.  The Court does not believe that reasonable jurists might find the Court's assessment of the

procedural or substantive issues presented in this case debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. § 2254(d)(2). *See Buck v. Davis*, 580 U.S. 100, 115 (2017) (standard for issuing a Certificate of Appealability) (citing *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003)).

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Liron Edwards for a writ of habeas corpus relief is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability shall not be issued.

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G.  FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 8th day of November, 2023.